**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**ASHLAND**

**CRIMINAL ACTION NO. 0:23-CR-015-DLB**

**UNITED STATES OF AMERICA**                                                    **PLAINTIFF**


**V.**                     **UNITED STATES' SENTENCING MEMORANDUM**


**NATHANIEL K. LUMPKINS**                                                       **DEFENDANT**


**\*\*\*\*\*\*\*\*\*\*\***

The United States, by and through the undersigned counsel, submit the following sentencing memorandum.  A sentence for the defendant within the guideline range of 63 to 78 months would represent a sentence sufficient, but not greater than necessary, to achieve the purposes of 18 U.S.C. § 3553(a).

**I.      The PSR's Guidelines Calculations Were Correct.**

The guidelines were correctly calculated in the Presentence Investigation Report ("PSR") at a total offense level of 26, criminal history category I, and imprisonment range of 63 to 78 months.  The United States had one request for clarification which was addressed in the addendum regarding the moment in which the defendant broke the victim's arm, but had no objections substantively to the guideline calculations or sentence.  The defense, who had specifically reserved the right in the plea agreement to contest the sentencing cross-reference to United States Sentencing Guideline ("U.S.S.G") § 2A2.2, objected to this application in the guidelines.  Counsel for defendant initially objected to any finding that the defendant caused bodily injury to L.J.; however, the defendant has already admitted to doing so, both as an

element of the offense in paragraph 2(d) of the plea agreement as well as in the underlying factual basis contained in paragraph 3(a) of the plea agreement.  DE 42.  Therefore, the United States will address the objection specifically reserved in paragraph 5(b) of the plea agreement as to whether or not the victim's injuries constitute serious bodily injury as defined in the Guidelines.

> **A. The defendant breaking L.J.'s arm, which required a trip to the emergency room and a cast, constituted serious bodily injury.**

The defendant's count of conviction, 18 U.S.C. § 242, normally falls within U.S.S.G. § 2H1.1.  However, § 2H1.1(a)(1) provides that the base offense level will be the greater of that calculated under either § 2H1.1 or "the offense guideline applicable to any underlying offense."  In this case, the PSR correctly found the underlying offense to be aggravated assault, defined in the Application Notes to U.S.S.G. § 2A2.2, in part, as "a felonious assault that involved . . . serious bodily injury."  § 2A2.2 begins with a base offense level of 14, which is greater than the base offense level of 10 in § 2H1.1(a)(3) that would be applicable to a crime like this one involving one participant and involving the use of force against a person.  Therefore, if the victim in this case suffered serious bodily injury, the base offense level will be calculated from § 2A2.2 before returning to § 2H1.1 for specific offense characteristics and adjustments.  If he did not, the base offense level would instead be calculated from the simple assault guideline, U.S.S.G. § 2A2.3, which yields an offense level of 11 because it involved physical contact as well substantial bodily injury to an individual under sixteen years of age (still higher than the base offense level of 10 under § 2H1.1).

Serious bodily injury is defined in the Guidelines as "injury involving extreme physical pain or the protracted impairment of a function of a bodily member . . . or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation."  U.S.S.G. § 1B1.1,

2

Application Note 1(M).  The Sixth Circuit has interpreted this language broadly, finding it "unlikely that the Sentencing Commission intended this particular enhancement to be withheld in all but the most extreme cases of serious bodily injury." *United States v. Tipton*, 11 F.3d 602, 610 (6th Cir. 1993) (quoting *United States v. Newman*, 931 F.2d 57 (6th Cir. 1991)).  In accordance with that language, the Sixth Circuit has found that a victim who suffered two broken bones around his eye as well as lacerations and pain suffered serious bodily injury, even though he did not experience "interminable pain or require[] a lengthy hospital stay." *United States v. Frazier*, 769 Fed. Appx. 268, 271 (6th Cir. 2019).  In this district, a victim who did not suffer any broken bones but did suffer pain, loss of consciousness, and an ankle sprain was also found to have suffered serious bodily injury.  *United States v. Jenkins*, 122 F. Supp. 3d 639, 646 (E.D. Ky. 2013).  Another circuit, specifically addressing the issue of broken bones, has held that "[a] broken bone, standing alone, can be a 'Serious Bodily Injury.'" *United States v. Anderson*, 380 F. App'x 597, 598 (9th Cir. 2010).

In this case, as correctly noted in the PSR, the victim immediately began complaining of arm and wrist pain in the arm upon which the defendant had used excessive force.  When examined by a nurse at the facility, the victim engaged in guarding behavior, did not have full use of his fingers, and stated he believed his arm was broken.  The nurse immediately ordered that the victim be sent to the emergency room, where an X-ray confirmed that he had buckle fractures of both the radius and ulna bones in his forearm. While at the hospital, the victim rated his pain as a nine out of ten.  The doctor put his arm in a cast and told the victim to return within 3 weeks for additional X-rays.

The victim's level of injury represents serious bodily injury.  First, as would be expected from a child whose arm was broken by a grown man putting his body weight down onto a

3

twisted wrist, the victim described to both the nurse and the doctor experiencing "extreme physical pain."  Second, his injury required hospitalization as well as follow-on treatment. Finally, a broken arm within a cast for at least weeks, if not longer, represents a "protracted impairment of a function of a bodily member."

Based on this, the PSR was correct in finding that the victim suffered serious bodily injury and that the defendant's guidelines should cross-reference to U.S.S.G. §2A2.2.  This begins with a base offense level of 14, with 5 offense levels added because the victim suffered serious bodily injury, leading to a base offense level of 19.  Other than that cross-reference, the defendant does not object to any other calculations in the PSR, consistent with his recommendations in the plea agreement, including the additional 6 levels for color of law (U.S.S.G. § 2H1.1(b)(1)), 2 levels because the victim was a vulnerable victim (U.S.S.G. § 3A1.1(b)(1)), 2 levels because the defendant attempted to obstruct justice (U.S.S.G. § 3C1.1), and a subtraction of 3 levels thanks to timely acceptance of responsibility (U.S.S.G. § 3E1.1). The PSR's total offense level of 26 was correctly calculated and should be adopted by the court.

## II.     A Sentence Within the Guidelines Range is Appropriate.

A sentence within the recommended guidelines range of 63 to 78 months would represent just punishment.  The United States also recommends one year of supervised release and agrees with the PSR's recommendation against a fine in this case.  The victim has been made aware of his right to restitution and has not made any requests for restitution.

### A. The Nature, Circumstances, and Seriousness of the Defendant's Crimes Merit A Guidelines Sentence.

As an initial matter, a guidelines sentence would reflect the nature, circumstances, and seriousness of the offenses.  The defendant, a former youth worker with the Department of

Juvenile Justice ("DJJ") is convicted of needlessly and cruelly breaking the arm of a fifteen-year-old in DJJ custody while the child was on the ground and already being held down by three other youth workers. This would be a serious crime in any circumstance, but particularly so when the defendant was entrusted by the state with ensuring the safety and security of the youth in his custody. Below is a screenshot from the video with the defendant in the foreground wearing a baseball cap, the victim on the ground, and the three other adults in the background:



The video shows as the defendant continually readjusts and applies more and more of his weight onto the child's arm. Witness statements and video also indicate that the defendant was repeatedly yelling at the victim during this encounter. The other youth workers did not see any reason for the defendant's actions, believed it was against their training with the Department of Juvenile Justice ("DJJ"), and thought he was acting out of anger and to punish the victim. Indeed, the two youth workers who initially began the interaction with the victim believed they

could have verbally de-escalated the situation and saw no reason for any use of force before the defendant ran between them and immediately escalated the situation by putting his hands on the victim.

The defendant then continued this behavior once the victim was escorted to an isolation cell.  As he and another youth worker entered the cell, the defendant once again yelled at the victim and needlessly slammed his injured hand against the concrete wall.  Once again, the other DJJ workers though the defendant's behavior was excessive, and his supervisor ordered the defendant out of the cell to avoid further injury to the victim.  Immediately after he is left alone in the cell, the video captures the victim sitting with his head down cradling his arm for an extended period of time.

In the aftermath, the defendant asked a supervisor what he should put in his report, to which the supervisor replied there wasn't anything the defendant could put that would justify his use of force and refused to help him further with his report.  The defendant then drafted a false report to attempt to justify his behavior, including by falsely claiming that the victim had threatened to kill his colleagues, that the victim had been physically aggressive, and that he had attempted to escort the victim to calm him down.  He also failed to mention that he had used an improper control technique, yelled at the victim, and slammed his hand into the wall of the isolation cell.  As he admitted in his plea agreement, he wrote these falsehoods and made these omissions in an attempt to avoid consequences for his abuse of the victim.

However, as aggravating as these circumstances are, they are all accounted for currently within the guidelines.  While it makes this crime far more serious that the defendant was acting under power given to him by the Commonwealth of Kentucky, that is already considered in the guidelines sentence through the agreed-upon color of law adjustment.  While the fact that he

6

used unreasonable force on a fifteen-year-old who weighed 127 pounds are aggravating facts, that is factored into the guidelines sentence thanks to the agreed-upon vulnerable victim adjustment. While the level of injury on the victim is serious, that is also considered already, assuming the Court adopts the PSR's guidelines and agrees that the cross-reference to aggravated assault applies due to the victim suffering bodily injury. Finally, while obstruction of justice is always a grave matter, the defendant's obstructive conduct is already included in the sentence thanks to the adjustment under U.S.S.G. § 3C1.1. Therefore, while the nature, circumstances, and seriousness of the offense all dictate a substantial sentence in order to provide just punishment, those factors are adequately addressed by the guidelines and a guidelines sentence would fulfill these sentencing purposes.

### B.  A Guidelines Sentence is Consistent with the Defendant's History and Characteristics.

The defendant's history and characteristics are both mitigating and aggravating. On the one hand, as noted in the PSR, the defendant has no criminal history and has served his community as a volunteer firefighter for many years, both mitigating facts in his favor.

On the other hand, this crime was not an isolated incident in the defendant's service with DJJ, simply the most egregious one. Several witnesses report that the defendant had displayed inappropriate anger towards youth and other staff prior to this incident. In fact, if this case had gone to trial, it was anticipated that one of the defendant's supervisors would testify that, after becoming the defendant's supervisor, he pulled him aside and warned him that his previous anger issues demonstrated at work were unacceptable and that he was on "thin ice." In spite of that, as admitted in the factual basis, the defendant was then disciplined for using unreasonable force on a youth in November 2018, just two months before the crime of conviction. In that instance, once again, the investigation revealed that the defendant used force out of anger to

punish a youth in the DJJ facility and that, most seriously, he used the exact same improper control technique by putting his entire weight onto the youth's arm.  He was suspended from his job as a result of this misconduct.  Fortunately, the youth did not suffer lasting injury in that case; however, the defendant's history of similar behavior previously are aggravating.

In sum, the defendant's history and characteristics cut both ways, and demonstrate that a presumptively reasonable sentence within the guidelines is the appropriate outcome in this matter.

### C.  A Guidelines Sentence Would Promote Respect for the Law.

While all crimes involve a concern of promoting respect for the law, crimes committed by someone sworn to uphold the law especially implicate this concern.  This principle is reflected by United States Sentencing Guideline ("U.S.S.G.") § 2H1.1(b)(1), which provides for a six-point increase in the total offense level for offenses committed under color of law.  This increase reflects a powerful judgment by the Sentencing Committee; six-point increases are comparatively rare under the Guidelines and reserved for extremely serious offense characteristics.  *See e.g.*, U.S.S.G. §§ 2B1.1(b)(2)(C), 3A1.2(c), 2L1.1(b)(8)(B), (providing six-point increases for fraud resulting in financial hardship to 25 or more victims, assaulting law enforcement officers, and harboring alien minors for purposes of prostitution).

The Commonwealth of Kentucky trusted and trained the defendant to ensure that children committed to its custody were kept safe and secure.  Given these advantages, the defendant was placed in a position of greater trust than an ordinary member of the public, and one where he was required not only to respect the law, but to enforce lawfully imposed juvenile adjudications.  As a result, his sentence should reflect the disrespect for the law that his conduct evinces.

8

A sentence within the applicable guidelines range strikes the right balance on these facts. In the same way that the guidelines reflect his low criminal history score, they also reflect how the assault and attempted cover up demonstrate both the defendant's lack of respect for the law as well as the importance of these sentences to promote respect for the law generally.

**D.  The Need for General Deterrence in This Case is High.**

A sentence within the guidelines range would also ensure the goal of general deterrence. While there is not a concern about deterring this specific defendant from re-offending, it is nevertheless vital to deter those similarly situated from committing the same offenses.  As an initial matter, anyone who acts under color of law needs to be adequately deterred from losing their temper and violating the law in the manner that the defendant did.  But specifically, DJJ employees have been the subject of numerous reports of unreasonable force and other misconduct.  DJJ has also recently become the subject of a pattern and practice investigation by the Special Litigation Section of the Civil Rights Division, including whether there is widespread use of unreasonable force by staff; while that is an entirely separate process unrelated to this district's criminal civil rights prosecutions and not specifically related to the defendant's case, it goes to show that there are serious concerns regarding other staff members' use of force at DJJ. Ensuring that other DJJ workers are deterred from committing the same kind of misconduct should be a significant factor in this case.  The sentence this court imposes should send a message to all DJJ employees, and all government employees in Kentucky who are tasked with ensuring the safety and security of those in their custody, that abusing both their positions and people their care is not taken lightly in this district.  A guidelines sentence would achieve this goal.

**III. Conclusion**

The guidelines were correctly calculated in the PSR, and a sentence within the recommended guidelines range of 63 to 78 months would represent a just punishment that would be sufficient but not greater than necessary to achieve the purposes of 18 U.S.C. § 3553(a).

Respectfully submitted,

CARLTON S. SHIER IV
UNITED STATES ATTORNEY

By:   *s/Zachary S. Dembo*
      Zach Dembo
      Assistant United States Attorney
      260 W. Vine Street, Suite 300
      Lexington, Kentucky 40507-1612
      (859) 685-4908
      Zachary.dembo@usdoj.gov

CERTIFICATE OF SERVICE

On October 8, 2024, I electronically filed this document through the ECF system, which will send the notice of electronic filing to counsel of record.

*s/Zachary S. Dembo*
Assistant United States Attorney

10